Good morning, your honors. I please the court, Steve Felton for Petro Soto. At trial, Mr. Soto was deprived of his right to a fair trial when the government elicited from a home seller, Beatrice Jemiche, not just that she was accusing Mr. Soto of stealing her house and that she felt he was not an honest person, but the government actually introduced evidence that Ms. Jemiche testified that her attorney, John Briggs, told her that Mr. Soto was not an honest person. And this testimony was improper for a number of reasons. Was that the written examination? Yes. I thought it was under cross by a co-defendant. I apologize. It was. I apologize. Stay corrected. Does that make a difference? No. It does not make a difference because How is the government responsible for a question that's asked by one of your or one of the defendant's court counsels or counsels for another defendant? How is the government responsible for that? Well, it's not that the government is responsible. It's that the court is responsible to not allow a witness to give that testimony in front of the jury. Sometimes defense counsel wants to get in hearsay of some types and hopes the governor will let it in or hopes the governor will be asleep at the switch or whatever. We all try a case sometimes you'd like to. When defense counsel asks a question and the witness gives an answer and defense counsel doesn't ask that it be stricken, why is the judge to take your case strategy away from you? Well, the reason is quite simple. There is no strategy in having a witness essentially usurp the function of the jury and say on the penultimate issue in the case, were the real estate sales legitimate or illegitimate? Here you have a witness saying to the jury that Pedro Soto stole the house from me and is a dishonest man. The judge should have sui sponte because there was no objection, not just admonished the jury, but instructed the jury that it could not consider that testimony, that that was solely an issue for the jury about whether it was a legitimate transaction or the house was stolen. But more importantly, when the judge heard the witness testify about what her witness said about Pedro Soto, the judge should have immediately instructed the jury that that was impermissible for a number of reasons. First of all, it was rank hearsay what the witness's attorney told her. But I'm still coming back to, this is on defense examination, sometimes when we're trying a case, you try to get a witness to say something preposterous or you need a witness to say all these outrageous things against your side because you know you'll not be able to impeach them. There are all sorts of trial strategies whereby you would elicit harmful testimony, including hearsay from a witness. How's the judge to know that that's not what you're doing if you don't tell the judge? Going back to what I said before, your honor, no witness is allowed to testify about what a lawyer told them about the honesty of a defendant. Well, your honor, that dovetails with the government's argument in its brief that basically this was just state of mind testimony. Isn't that a good argument? It's not. No way. Because a witness's state of mind has nothing to do with hearsay. What the witness was talking about was what her lawyer told her about the defendant. But your honor, even much more important than that. She was explaining why she didn't sign the papers. That's true. Am I right? But if it was, in fact, state of mind testimony, the district court judge should have instructed the jury on the proper use of that testimony. Because otherwise, the jury could have used it for an improper purpose, and they could have accepted it as fact instead of state of mind evidence. And there is no charge in the record, contemporaneous or otherwise, where the judge instructed the jury that this is state of mind evidence and it should only be used for state of mind and not to accept as true and as fact that the witness's lawyer told her that Pedro Soto was a dishonest man. But isn't that why we have charging conferences? In other words, didn't the judge ask, did you try this case? No, I did not. Didn't the judge ask trial counsel, what instructions would you like me to give to the jury? That's true. But it was not done contemporaneously. No one asked the judge at that point either. The defense counsel did not make a request for a charge regarding state of mind evidence. But the district court should have done it because this testimony was absolutely devastating in this case. The hearsay, the character assassination of Pedro Soto, and one other point about how this court should analyze this issue, because the district court judge did admonish the witness just to answer the question. And as a result, defense counsel apparently saw no need to interpose a contemporaneous objection. All he would have been doing was echoing what the district court judge had instructed the witness to do, to just answer the question and not to make these. Counsel, there was nothing that prevented counsel from moving to strike the testimony. That's correct. And because there was no motion to strike and because there was no objection, I mean, I just want you to appreciate that you're asking us to find under a very high standard. Well, that is, first of all, the defense feels it was played out. But on the issue of whether the court should review this under a harmless error standard, the sound interim purpose of the objection rule was met when the judge admonished the witness. The judge didn't go far enough, and Sue Sponte issued an instruction about the proper use of state-of-mind evidence. But there was no point of once the judge admonished the witness for defense counsel to stand up and utter two words, I object. The judge was already doing that for defense counsel. It's the other three words, motion to strike, that were not uttered in the courtroom. That's true. Defense counsel should have moved to strike this testimony. But there's a bigger issue, Judge Thompson, and that's the fairness of a trial when a witness is engaging in these kind of attacks against a defendant who is not testifying. Basically, his character is being impugned, and he hasn't even taken a stand in his defense. Well, is there any other evidence against your defendant other than these statements? There was evidence that there was. But, Judge Torreira, the point is that regardless of the quantum of proof, a defendant is still entitled to a fair trial. And I want a jury of attorneys to deliberate. And in speaking about a witness saying, he stole my house, he's a dishonest man. And her lawyer is saying to her, he's a dishonest man. That can tip the scales in the jury room against the defendant because that kind of testimony is so devastating. It's not a fact that the witness is testifying about. She's testifying about hearsay, other people's opinions of the defendant, and that's improper. So I would urge the court to review this under abuse of discretion, a homelessness standard, and not plain error. Because the defense counsel had the judge admonish the witness so there was no need for him to object. Thank you very much, Your Honors. Thank you. Mr. Faulkner? Good morning. Good morning, Your Honors. My name is Benjamin Faulkner and I represent the appellant, Stephen Soto. Your Honors, may I reserve two minutes for the court? Yes, you may. Your Honor, the central issue that Mr. Soto raises before this court was the denial of the defendant's motion to suppress. We have here in this case a primary illegality, a primary unconstitutionality that was found by Judge Toro. There's no question in this case as to the fact that the April 28, 2006 search of the 56 Lawrence Road residence was indeed unconstitutional. And so the question before this court is, were the February 2007 search of the Gateway Laptop and the May 2007 search of that residence true to the poisonous tree or were they truly independent and admissible under the independent source doctrine, having dissipated the taint of the primary illegality? And what we have here is after the April 28, 2006 search of the 56 Lawrence Road residence, law enforcement essentially discovered a treasure trove of information. They discovered hundreds of documents, a computer that was subsequently searched, two motorcycles which were the very motorcycles that were stolen and confirmed that there was motorcycle fraud. As a result of the search, the main agent, Mr. Everett, learned that the investigation was, in his words, bigger than just motorcycles. As a result of the information that was gotten during the April 2006 search, law enforcement presented the case to the United States Attorney. It had been before that a local investigation. It was referred in June and July of 2006 to the United States Attorney's Office who took the case up. There were essentially hundreds and hundreds of leads. There were subpoenas that were issued to banks. Law enforcement, as of December of 2006, was still investigating the case of the motorcycles and was still investigating the case in the words of Mr. Everett right down to February of 2007 when Stephen Soto was arrested. When Stephen Soto was arrested, there was some additional information that law enforcement had gained. And that information was not necessarily as a result of the search. And basically what they learned was this. Stephen Soto had presented an identification. He had gotten open bank accounts and bought vehicles in the name of Gregory Bradley. But what they didn't get was any reference to the use of a computer. When you look at these affidavits that were sought by particularly the affidavit in support of the search warrant, and I'll refer you on this to page 124 to 125 and actually right up through 128 of the record appendix, that's the affidavit in support of the search warrant for the computer. When the tainted information is taken away from that affidavit, there simply is not probable cause to believe that there's going to be evidence found on that computer. But there's no indication aside from the tainted portions of the affidavit which indicate that those documents were created with a computer. But how else are documents created? Well, some of the counterfeit documents include things like a counterfeit driver's license. We don't know whether that was created by the Registry of Motor Vehicles or on a computer. There is some suggestion in paragraph 10 of the affidavit that a previous computer was used to generate exactly these kinds of documents. But that's a tainted paragraph, and it taints the entire affidavit. Right. So we exclude that. But suppose the only fact we know is that someone has generated a few counterfeit documents. But we don't know that Steven Soto has created any of the documents. We just know that he has regular documents. He's got some and he's using them. Right. Isn't the computer one of the first places you go to look to see if you've got earlier versions to show how they might have been created? Well, we don't have anything in this affidavit which suggests that law enforcement believes that a computer is a place that it would go. We don't have a paragraph in this affidavit which suggests these are the kinds of documents that get created on a computer. In my training and experience, the only criminals that are involved in this type of fraud typically use a computer to create these kinds of documents. But what else would he have used? Well, he can simply go into the registry of motor vehicles and purport to be somebody else and obtain a driver's license in the name of Gregory Bradley. There's no indication that he created these documents as opposed to obtaining them from other sources. In shifting back, that really goes to the second prong, and that's whether the magistrate would have issued the search warrant. I think more importantly, the judge's findings that the search warrant would have been gone after by Agent Everett are clearly erroneous. And I think pages 364 and 365 of the record appendix are particularly relevant. The court asks essentially whether he would have applied for the warrant had he only had the information that he had had before the April 2006 search. And the response is telling. Yes, Your Honor, to answer your question, I would have sought at a minimum a warrant for 56 Lawrence, his residence, to see if we could find other materials related to what we already established in his home. In other words, to see if we can find materials that are the same materials we found the first time around. And I think that's telling as to his motive. And the court doesn't address that statement. We don't have here the kind of contemporaneous evidence that there are in these kinds of cases. The kinds of cases where the agent's motives are found to be justified include cases where an agent was already preparing the search warrant, new information comes along, and that information may or may not be included in the search warrant, but we know that that agent was going to go do that search. That's not the case here. The search had been performed long before these 2007 search warrants were gotten. And I think... We would have to find... It's a subjective determination by the court below, so we'd need to find it was a clearly erroneous interpretation of the agent's state of mind. That's correct, Your Honor. That's a heavy... It is a heavy bond, Your Honor, but I would suggest that on the record that we have here, the investigation is so intertwined with the information that's presented in these later warrants. I see you have 10 seconds. May I finish answering your question, Your Honor? Yes. The information here that is presented in these search warrants and is presented first in these search warrants in the first factual paragraphs and in a large section is intertwined with this. We've got a long investigation, and in all of the circumstances that are present here, we have nothing other than the agent's blanket assurances that he would have searched for it anyways. And even when the agent says, I would have searched for it anyways, he says, I would have searched for it anyways in order to find information consistent with what we found the first time around. So, if there are no further questions, I rest. Thank you. Thank you. Mr. Kudlow, good morning. Good morning, Your Honors. Matthew Kamholtz with Carmen Soto. I'd like to focus my argument on the restitution issue. The district court judge ordered restitution in this case against Carmen Soto in an amount of approximately $792,000, which was the full amount of the loss that the judge calculated for purposes of sentencing generally under 2B1.1. That is, the total amount of the intended loss. The government, just as a preliminary matter, the government makes a claim that there was no objection to this and that review of this court, that restitution order, has to be for plain error. My view is different. There was certainly discussion about this order, and I think that the judge clearly understood that there was an objection. In fact, the court interrupted counsel in his remarks about the restitution order, and the basis for the objection was also quite clearly stated. When counsel noted quite correctly that in sentencing the defendant, that is to say, in varying from the guideline sentence that the court took into account multiple causation for the loss, and yet failed to do that with respect to the restitution, the judge was clearly aware that that was the basis of the objection. The judge interrupted counsel and said, you know, I've considered this, but I am going to order restitution in the full amount. If not that, then I'm going to impose a fine. And at that point, the matter rested. So I do think that the judge was aware of the basis of the objection, and I do think that the court ought to review this for essentially abusive discretion. Otherwise, of course, the review is for plain error, and I also think that the burden is met under that standard. Because restitution, unlike the amount of the loss calculation under 2B1.1, has to be for the loss actually sustained and caused, approximately caused, by the defendant's conduct. I knew right in the beginning that if the victim is negligent, then there isn't full restitution. Because the negligence contributed to the... Essentially, yes. And I think that's a useful way to think about it. But that puzzles me. I mean, if the police tell me there's a robber in my neighborhood, and I go out for a week and negligently don't lock my house, and the robber comes in and takes $1,000, it would seem very odd if I couldn't get the $1,000 back from someone who robbed my house because I was negligent in not locking my door. Well, I can see where for sentencing, maybe, take it into consideration. Well, you know, I think that actually in your case, it's more appropriate... Well, it's a judgment call for the sentencing judge in both situations. And here we have actually a finding by Judge Wolf that there was multiple causation and that the victims themselves, and he uses the words their greed and lax standards are words to that effect. Right. He quite specifically faults that. And by the way, as simply a corollary, his findings on that score are fully supported by the GAO report, which counsel tried to get into evidence but which the court rejected as being evidence before the jury. So there was no question that Judge Wolf found, as a matter of fact, that the victims' conduct contributed to their loss. I think in your hypothetical, a judge would have to make that finding. But it seems odd if one conduct is negligence of the victim, not protecting themselves, and the other conduct that contributes to the cause is criminal conduct. Yeah. It seems to me some basic notions of fair play suggest that the criminal has to give back, and literally under your scenario, if he stole $1,000 from my house and I was really negligent in leaving the door open and the court found that he wouldn't rob the house but for the door being open, he'd have to give me what he'd pocket, $400, and give me back $600? Well, in this case, we're not talking at all about victims not protecting themselves. We're talking about victims affirmatively ignoring industry standards. We're talking about victims affirmatively ignoring misrepresentations that they're aware of. I mean, the level of culpability of the victims in this case was quite high. But I think you're still saying because of that, he gets to keep some of the money he stole from them. Well, maybe in your case. Certainly not in this one because it wasn't money he took by thought. Isn't it? Well, what are you saying? Are you saying that it should be apportioned? What are you saying? That's exactly right. And how would you apportion it? Well, I think that's up to the judge to hear. How would you apportion it? I think that, well, for instance, in varying from the sentences, the judge, I think almost across the board, reduced, and you see this I think most clearly in Pedro's sentence, where the only factor cited by the court for reducing the sentence was this issue of multiple causation. And in those circumstances, I believe it amounted to a four-level reduction, which is a loss equivalent of, I forget the number off the top of my head, but maybe $300,000 or $400,000 difference would get him into a lower category. Something along those lines. We don't know, in fact, what the proper reduction would have been, but I think the judge should have taken evidence on it and the judge should have considered it and arguments should have been made about it. Is restitution part of punishment for having committed a criminal wrong? I don't think so. Well, why not? Why don't you think so? Well, I think a fine is part of punishment for committing a criminal wrong, but restitution is to make the victim whole. And when it's the victim's own conduct that is contributing to his loss, then the victim shouldn't get a willful by being compensated for that. Neither should the thief. Pardon? Neither should the thief. I'm sorry. I misunderstood you. You say that the victim should not get a willful. And I say that neither should the thief. That's correct. There needs to be some judgment made as to what the proper apportionment is. Because those are the two violated criminal law. That's correct. No question about you. But the victims in this case also violated, if not criminal law, certainly professional standards in the industry. They caused, I mean, it was the actions of these type of lenders that in fact led to the financial crisis that we all went through. So these were not blameless victims by any means. They didn't violate any law as far as I could see. Well, you know. They were not found guilty of committing a crime, let's put it that way. Well, I think that's certainly true. Well, that makes a difference, I mean. Well, it does make a difference. On the other hand, there was evidence in this case where closing attorneys representing some of these lenders were told flat out that some of these statements in the loan applications was false and they couldn't have cared less. The goal of these lending companies was to move these loans as fast as possible, to get the money out the door as soon as possible, to then sell these loans to third parties and for them to essentially be bundled and resold. Right, so shame on them, but then why does the person who defrauded them not have to pay them back for at least the full loan caused by the fraud? That's where we're missing. You've got someone negligent civilly and then a criminal who harms them. Well, you know, the government cites these cases that are decided under the statute calling for restitution of victims of sexual offenses. And in those cases you have sort of, to make the civil analogy, you have sort of joint tort fuses. You have multiple wrongdoers who caused the harm, people that either took the photograph and disseminated the photograph and all of that sort of thing. We're not talking about, again to continue the civil analogy, contributory negligence, which is what we have here. That's a civil doctrine. That's correct. There's not any precedent for being a doctrine of criminal law in the area of restitution. Well, getting back to Judge Torrio's point, the issue of a fine is to impose punishment, but the issue of restitution is to make the victim whole only for that portion of the harm that was approximately caused by the defendant's wrongdoing. And where's the part of the punishment? Well, but where some of that harm is caused… You're correct that it's to make the victim harm, but it's part of the punishment. Actually, it's importation from the European civil system where they've always had that kind of remedy. But it doesn't change the subject. Thank you, Your Honors. Thank you. Good morning, Mr. Pelletieri. Yes. Good morning, Your Honors. May it please the Court, John Pelletieri from the Department of Justice on behalf of the United States. The district court was required to award restitution in the full amount of the loss approximately caused by the conduct of the defendant, and specifically here we're talking about Carmen Soto. Well, we don't really need to decide that, do we? We just need to decide the judge was certainly entitled to, whether he was required to or not. Right. But the issue is he's required to award in the full amount that's approximately caused. So the district court in this case found that the $700,000-plus that represented the difference between the loan amounts and the foreclosure sale prices was proximately caused by Carmen Soto. The court found that, didn't use the phrase proximate causation because the defendants never raised the proximate causation issue, and in our view that's why this is on plain error review, but the court did make this finding in the context of actual loss for the guidelines calculation when the court found that the full amount of the $700,000-plus was reasonably foreseeable to Carmen Soto in the context of this case because she was... Go ahead. I'm just getting ready to answer your question, but you can finish. Okay. She was very experienced in the real estate industry. She knew it was a vulnerable market and that the lenders were making a lot of loans and making it easy to obtain loans, and she knew that all these properties would all go into foreclosure. So the court made those specific findings that the losses of these lenders was reasonably foreseeable to Carmen Soto, and the reasonable foreseeable standard is how proximate causation is typically conceived. Now, as I mentioned, the court did not use the term proximate causation, but the reasonable foreseeable analysis conducted establishes proximate causation in this case. Who were the victims? The victims were the banks who made the loans. Did they pass these loans on forward? The letter does not... Who purchased the loans? And those are the ones who were getting the money back? Well, if, for example, Bank A made the loan for $100,000 and then it went and sold the loan, the mortgage, to Bank B for $90,000 and then Bank B foreclosed for $30,000, Carmen Soto would have owed $60,000 to Bank B and $10,000 to Bank A. But this case does not establish on the record whether there were subsequent sales of these loans, and that wasn't raised below. This claim was not raised below, in our view, isn't adequately raised in the appellate briefs. And, for example, it could be that... And we do recognize that in the PSR, there are different names of the lenders and the institution that foreclosed, but the record does not establish, because this was not raised below, whether those are, for example, successor entities. Many of the lenders during the financial crisis were acquired by other entities. And if, for example, Bank A made a loan for $100,000 and then was acquired by Institution B, and then Institution B, after acquiring the assets and the liabilities of Bank A, foreclosed for $30,000, then Carmen Soto would owe $70,000 to Bank B. And the record in this case doesn't... It's not enough for us to determine an unplanar review that would result in the need to affirm in this case, because there's no basis in the record to conclude that they were sold to a successor, secondary purchaser in this case. Thank you. Sure. What about the argument on the computer, the warrant for the search of the computer? Yes. The excise warrant to search the computer established probable cause for that search. The warrant established that the computer was in a car that Steven Soto drove to Eastern Bank in order to pretend to be Gregory Bradley and used it when he was going to cash a check in Gregory Bradley's name. And then, when he was arrested, he phone-called his girlfriend, Jessica O'Mara, and said, don't come to the police station with the Chrysler. Now, the computer was found in that car, which Steven Soto told Jessica O'Mara not to bring to the station, and it was found with a forged power of attorney and with documents showing that Steven Soto had purchased vehicles in Gregory Bradley's name when Gregory Bradley was in jail. And in addition, there's the officer's informed opinion, given his experience, that there's likely to be evidence of fraud and identity theft, the specific types of violations in this case, on the computer, because of the nature of those offenses and where one would typically find evidence of that sort. And all of those collectively establish a reasonable foreseeability that there would be evidence of criminality on that computer. And to be clear, the standard isn't a preponderance of the evidence. It's a reasonable probability. It's less than a preponderance. It's a common-sense determination in light of all the factors whether there will be evidence of criminality in a particular place that's searched. And that standard was satisfied in this case in light of the allegations in the excise document, which included all the circumstances surrounding the presence of that computer, all the documents contained in it that was brought to the bank and told not to be brought to the police station, and the police station's informed opinion about the likelihood of evidence on that computer. There was also no clear error in the district court's determination that the police would have sought and applied for this warrant even absent the earlier 2006 search that, for purposes of this litigation, is deemed unconstitutional given Judge Toro's ruling, which has collateral estoppel effect in this case. These are the facts that occurred in the context of the first and the second search warrants here. In March and April 2006, the police developed a lot of information regarding Stephen Soto's use of Malabar's espinal's identity and the identity of others to fraudulently purchase motorcycles. In fact, there was enough evidence to obtain a search warrant. There was enough to establish probable cause that he committed these offenses to obtain a search warrant, an arrest warrant, to arrest Stephen Soto. Then, when they went to execute the arrest warrant, and before they went to execute the arrest warrant, Agent Everett of the U.S. Secret Service was brought into the case and briefed on the issue. And they all went to go execute the arrest warrant. And when Stephen Soto wasn't there, an officer saw one of the motorcycles in the house and the officers obtained a search warrant for the house based in part on viewing the motorcycle. And that viewing was what Judge Toro later determined was illegal. Now, the evidence that was obtained in the search of the house at that point in time were all related to these motorcycle offenses. It was only after that search was conducted, that search was conducted in April 2006, and the use of Gregory Bradley's identity didn't start until the fall of 2006. And the Wednesday transactions in this case didn't even occur until the fall end of 2006 into January 2007. And then, when Stephen Soto went to Eastern Bank to fraudulently cash these checks and pretended to be Gregory Bradley, that's when all of this other information came out about the use of Gregory Bradley's identity and the real estate transactions. And all of that is what prompted the later search warrant and the information that was obtained and sought in that search warrant related to these separate later criminality, these separate later conduct. And the police would have sought and obtained that search warrant even if the 2006 search, April 2006 search, had never occurred. Unless the court has any additional questions. I have a question. Sure. Didn't you raise in your brief that the agent asserted that he did rely on information that they got from the 2006 investigation in applying for a warrant? Yes. Well, now when police have knowledge of an unlawful prior search, they don't at the time necessarily know it was unlawful, of course they're going to take that into account among many other things when deciding whether to move forward. And the Siciliano case makes clear that even if the police actually took that into account when deciding to go and seek the second warrant, that's not dispositive or really a relevant inquiry. The relevant inquiry is really a counterfactual. The question is, if that prior unlawful search had never happened, would the police still have sought that search warrant, regardless of what the later search warrant, regardless of whether the police, in fact, in this case, took that prior search, unlawful search, subjectively into account, the question is a counterfactual. Whether if what had happened had not happened, would the police later have sought that second search warrant? I don't remember. Do you state specifically what parts of that 2006 investigation you relied on, the agent relied on? When he made the decision, when he was thinking, oh, we should go get another warrant and took that into account, I don't think that's clear from the testimony, but it's also not relevant for purposes of the actual inquiry that has to be done here, the legal inquiry, the factual inquiry. The inquiry that has to be conducted is, again, a counterfactual. We ask, if the prior search warrant had not occurred, would the police still have sought the second search warrant? And we look at the subject, first what we look at is the testimony here of the agent who said, yes, we would have obtained it, but this court makes clear that we don't just accept those assurances. We look at all of the objective circumstances to determine whether they corroborate that assurance to allow us to conclude that we look at those objective circumstances in light of what a reasonable officer would do under those circumstances to determine whether they corroborate the police officer's assurances. And all of those circumstances in this case do corroborate Agent Everett's assurance, his testimony, that yes, I would have sought that search warrant, that second search warrant, even if I didn't know anything that had occurred or that had been obtained from the prior search. Even though, yes, I did know that, and so obviously when I'm making decisions, that's part of my decision making, and I can't change the fact that I knew it. It's a counterfactual inquiry that asks what the police would have done had the prior search not occurred. Unless the court has any additional questions, we'll rest on a brief. Thank you, Your Honor. Can you address my question from your side of the case? Can you repeat the specific question one more time? Well, I would like to know this lobotomy that takes place between part of the original investigation and the actions that are taken thereafter by the agent. Well, I think one of the problems is it's very difficult to sort that out in this case, and one of the reasons why it's so difficult to sort it out is because the investigation sort of mushroomed. The minute they did the search of the April 2006 house, they had, as I stated in my opening argument, essentially a treasure trove of information. So the information, they didn't have any information before the April 2008-2006 search linking anything to 56 Lawrence Road, and they didn't have anything before that search linking to computers. What's your best case on this issue? Well, I think the Murray is the best case on this issue. I think Murray, the United States Supreme Court case, is the best case on the issue. Murray? Yes. And I just wanted to also address, while I've got the opportunity, two points made during the government's argument. The government argued that the agent gave his informed opinion that the laptop was likely to possess this information. That's a paragraph 20 of his affidavit on page 128 of the record appendix, and that's based on his training and experience. He believes this laptop will have evidence of the crime. That's just an assertion that he has probable cause, and it's also based on the experience that he recounts earlier in this affidavit about how he found that evidence on a computer in this very case. And secondly, Your Honor, is the testimony that I quoted for you in my opening argument, is that he knew once he received all the information from the April 28, 2006 search, that this case was about bigger than just motorcycles. And so I would suggest that there's plenty of evidence that the substantial motivating factor is having gotten this warrant was the ill-gotten information. Thank you. Thank you, Your Honor.